PATRICK GRANT, appellant,

*v.*

JOHN J. STAMLER, executor, et al., respondents.

[Submitted October 18th, 1904. Filed January 10th, 1905.]

1. The opinion of physicians that testatrix was incapable of making a will is not controlling on the issue of testamentary capacity, and does not preclude the court from acting on evidence satisfying it of the existence of such capacity.

2. An executor and proponent of a will and the beneficiary thereof are competent to testify as to transactions with decedent evidencing testamentary capacity, but their interest may be considered in determining their credibility.

3. Evidence held to show that testatrix was of sufficient capacity to make a will.

4. The uncontradicted testimony of the beneficiary of a will that there was no attempt on her part to influence testatrix's testamentary disposition, and that the subject of the will was not even mentioned between them, supports a finding that there was no undue influence exercised by the beneficiary over testatrix.

5. Where, in a will contest, it was shown that contestant had so acted, in a business transaction with testatrix, as in effect to recognize her contractual capacity, and he made no attempt to deny or disprove such action, but nevertheless continued the contest, he was not entitled to counsel fees.

On appeal from the Union county orphans court.

*Mr. George W. Flaacke, Jr.,* for the appellant.

*Mr. Samuel Koestler* and *Mr. Patrick H. Gilhooly,* for the respondents.

MAGIE, ORDINARY.

A paper writing purporting to be the last will and testament of Mary Grant, deceased, dated September 27th, 1903, was admitted to probate by the surrogate. Patrick Grant, the father of Mary Grant, appealed from the action of the surrogate to the orphans court, and that court affirmed the surrogate's decree and dismissed the appeal.

From the decree of the orphans court Patrick Grant has appealed to this court, and now claims that it was erroneously made on two grounds—*first,* that upon the proofs before that court Mary Grant was shown not to have possessed testamentary capacity at the time she executed the alleged will; and *second,* that the making of the alleged will by her was also shown to have been the result of undue influence exerted upon her by Margaret McGuire, the principal beneficiary named therein.

It is established by the proofs, and conceded, that Mary Grant had been, for five years prior to August 12th, 1903, in confinement in the Manhattan Hospital for the Insane on Ward's

island.  On that day she was discharged by the officers thereof as "improved," and she was immediately brought to Elizabeth to the house of Margaret McGuire, wife of a distant relative.  The discharge was made on the solicitation of Patrick Grant, her father and the appellant, and the removal to Mrs. McGuire's house was at his request and by an arrangement made with her in the presence of deceased that Mrs. McGuire was to take him and his daughter as boarders in the family.  Decedent was then seriously ill with consumption, and a local physician was called to her on the next day, who treated her from that time to her death, on October 12th, following.  On September 27th she executed the testamentary paper, and its execution was in all respects such as is required by our statute.

In addition to the presumption which might be raised by the proof of her long confinement in a place for the treatment of persons having mental disease, the appellant produced two physicians, employed in that hospital during the whole period of her confinement there, who testified to their observation of her up to a period shortly before her discharge.  They unite in declaring that when admitted she was suffering from melancholia and that she indicated that she believed she had committed unpardonable sins, for which she was to suffer punishment after death; that her conduct, at first boisterous and unrestrained, became gradually more restrained, and, as they say, she became more tractable and was discharged as "improved," which, they explain, ought not to express mental improvement, but rather a condition of greater quiet and tractableness, which rendered it improbable that she would do injury to herself or others.  But they agree that, when discharged, she was, in their judgment, insane, and that the discharge was permitted because her father desired it, and because she was suffering from consumption and not likely to survive long.

It is evident that Mary Grant was properly classed among those who are insane, as classified by physicians devoted to mental disease.  Whether the mere existence in her mind of a delusion on the subject of her future state would require a court to pronounce her incapable of making a testamentary disposition of her property, not influenced by such delusion, is another ques-

tion. The opinion expressed by these physicians that she was incapable of making a will cannot require the court to ignore a testamentary disposition, if the evidence satisfactorily establishes that a testator possessed capacity to make it, under the liberal rules laid down by our courts. Their further expression of opinion that, judging from her condition when they last observed her, she would not become more capable of making a will, while to be considered, must obviously yield to evidence that satisfies the judgment that she did in fact possess testamentary capacity at the time she executed her will.

The orphans court placed reliance on the evidence produced by the proponent of the will as to the capacity of Mary Grant to make a will on September 27th. Evidence of her *status* before and after must be considered, but the important evidence is that respecting her condition at the time the will was executed.

Proponent offered himself as a witness and his testimony was taken. He called the subscribing witnesses to the will, Mrs. McGuire, the principal beneficiary, her daughter, her sister, her sister-in-law, her husband, and a boarder in the house during Mary Grant's residence there, and also the attending physician. Counsel for appellant contend that the evidence of the proponent, who is named as executor, and of the beneficiary ought to be rejected so far as it relates to transactions with the decedent. No ground is stated or discoverable for the exclusion of this testimony. But as far as the witnesses are interested, that circumstance is to be considered in determining what credit to give to their evidence.

Without taking space for an analysis of the evidence thus produced, I think it justifies the conclusion—*first,* that during that period Mary Grant did not disclose the illusion of which the doctors testified, and that she conducted herself as a sane person; *second,* that she knew the property of which she was possessed and where it was invested, and was desirous of disposing of it by will because conscious of the fatal nature of her illness; that she knew that her father was a man of great age, of whom she was fond, as her conduct showed, and that she had no other near relatives; and *third,* that she formed a judgment as to what she should do with her property with a consideration of the circum-

stances, and that she employed means to have her intention in the distribution of her property put into effect such as a sane person would adopt.

I am aware that appellant relies upon the testimony of two witnesses to show that Mary Grant at one time, and that near the 27th of September, used language plainly indicating a continuance of her illusion. But one of those witnesses fails to remember any such language, and although a child of only eight years of age, fails to testify in agreement with the other, who is her sister. The testimony of the other witness is so extravagant and unnatural, and so contradicted by other witnesses, as to justify its being disregarded as incredible. The subscribing witnesses to the will were evidently intelligent gentlemen, although, from having no previous acquaintance with decedent, their judgment as to her sanity at the time they saw her has not much weight. But they plainly show such conduct on her part as evinced appreciation of what business she was engaged in and a determination to execute the will.

In this connection I deem it proper to say that I have examined with particular care the evidence of the proponent of this will. He is an attorney lately admitted to the bar. He was notified that Mary Grant desired to see him professionally, and went to Mrs. McGuire's house and had an interview alone with Mary Grant. He testifies that she told him she desired to make a will and to leave the most of her property to Mrs. McGuire for her kindness to her. As she also told him that she had been confined in a hospital for the insane, he hesitated, and did not take definite instructions at that time, but made an appointment for an interview the next day. As he was about to leave the house he was met by Mrs. McGuire. He was told by her of Mary Grant's confinement in the hospital. He then learned who was the attending physician of Mary Grant and went to him. Having received his opinion that she possessed testamentary capacity, he returned to Mary Grant the next day and then received definite instructions, which were to draw a will giving to her father $100, and the residue of her property to Mrs. McGuire. Thereupon the attorney adroitly called her attention to the small amount provided for her father, while all the residue was to go

to Mrs. McGuire. He testifies that she gave him two reasons for her distribution—one, that her father was provided with sufficient money and would be as well pleased with $100 as with the whole; and the other, that she desired to compensate Mrs. McGuire for her kindness. If the first reason she gave was false, its falsity might tend to influence the judgment as to her capacity. But its falsity was not shown, the father, who could undoubtedly have disclosed the truth, not having been called as a witness. As to the other reason, it is in accord with the other statements of Mary Grant to the effect that she longed to be removed from the hospital, where she said she never ought to have been, and was full of gratitude to Mrs. McGuire for having consented to take her to her house, whereby she was enabled to bring about her release.

Upon the whole evidence I think the court below justly attributed to Mary Grant sufficient capacity to make this will.

But it is further contended that the proofs show that the will was the product of undue influence exerted by Mrs. McGuire, the principal beneficiary.

It is a fair presumption that Mary Grant, after her five years' confinement and her release, would be likely to be influenced by those who effected that release—her father and Mrs. McGuire. She was, moreover, in the house of Mrs. McGuire, in which her father also lived. There is nothing in the proofs to show that Mrs. McGuire ever exerted any authority or influence upon decedent. There is nothing to justify an inference of influence, except the propinquity and opportunity to exert it. Nor is there much to indicate that there ever existed between Mrs. McGuire and Mary Grant a confidential relation, which, existing, would cast on the beneficiary the burden of satisfying the court that no advantage was taken of such confidence and no dominating influence was exerted.

If this burden was cast on Mrs. McGuire, it is my judgment that she has sustained it. She testifies that not only was there no attempt on her part to influence decedent's testamentary disposition, but that the subject of the will was not mentioned between them. I do not feel able to disregard this evidence, and deem that it forbids the reversal of the decree below on the ground of undue influence.

*2 Robbins.* Grant *v.* Stamler.

The decree appealed from must be affirmed.

After the decree was pronounced, application was made to the court below for an allowance out of decedent's estate of the costs of appellant and a counsel fee for the counsel who appeared for him in the contest below. The orphans court made an allowance of $50 for costs, and refused to allow any counsel fee. The order which embodied this conclusion has also been appealed from.

I agree with the results reached, but not for the reasons given. With respect to capacity, the evidence of the subscribing witnesses possessed very little force, because they had no previous acquaintance with her. But so far as capacity is concerned, the appellant was shown to have so acted as to recognize it. It was made to appear that what decedent possessed was all deposited in three savings banks in New York. While she was living at Mrs. McGuire's appellant accompanied her and Mrs. McGuire to New York, and went to one of the banks, where, in his presence, and without any protest on his part, she drew out $1,040, all of her deposit therein, surrendering her bank book, the voucher for her deposit. This money was paid to her and she immediately handed it to him. What occurred between them would seem to indicate that she entrusted him with it to be used for the payment of her charges and expenses. It may perhaps be understood as showing a gift *inter vivos.* But whatever was its legal effect, the transaction indicated that appellant recognized decedent's capacity to release and discharge her debtor, and to place her money in his hands either in trust or as a gift. When this fact appeared I think the contest ought to have ended, unless appellant was prepared to deny or disprove it. No such counter-proof or denial was made.

Another reason leads to the same result. The testimony was extended by the production of repetitious and irrelevant matter to such an extent as to forbid imposing upon the small estate a burden so great. Nearly five hundred typewritten pages were submitted to me, and in my judgment all of the important evidence might have been presented in less than half that space.

The order appealed from will also be affirmed.